UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- x
M.M. and I.F., on behalf of L.F.,                    :     **ORDER AND OPINION**
                                                     :     **GRANTING SUMMARY**
                           Plaintiffs,               :     **JUDGMENT**
                                                     :
       -against-                                     :     11 Civ. 3517 (AKH)
                                                     :
NEW YORK CITY DEPARTMENT OF                          :     USDC SDNY
EDUCATION,                                           :     DOCUMENT
                                                     :     ELECTRONICALLY FILED
                           Defendant.                :     DOC #:_____
-------------------------------------------------------------- x     DATE FILED: 6/17/14
ALVIN K. HELLERSTEIN, U.S.D.J.:

      Plaintiffs M.M. and I.F. ("the Parents") bring this action against the New York City Department of Education (the "DOE") pursuant to the Individuals with Disabilities Education Act (the "IDEA"), 20 U.S.C. § 1400 *et seq.* The Parents seek reimbursement from the DOE for tuition paid to La Europa Academy, a private school in Utah, where their daughter L.F. was educated. The Parents seek review of a January 24, 2011 decision by the New York State Review Officer which denied their request for reimbursement. The parties have cross-moved for summary judgment. For the following reasons, the Parents' motion is granted and the DOE's motion is denied.

## STATUTORY FRAMEWORK

      "The IDEA requires New York state to provide disabled children with a free and appropriate public education ('FAPE')." *M.W. ex rel. S.W. v. New York City Dep't of Educ.*, 725 F.3d 131, 135 (2d Cir. 2013). "To ensure that qualifying children receive a FAPE, a school district must create an individualized education program ("IEP") for each [disabled] child." *R.E. ex rel. J.E v. New York City Dep't of Educ.*, 694 F.3d 167, 175 (2d Cir. 2012). An IEP is a written statement that "describes the specially designed instruction and services that will enable the child to meet stated educational objectives and is reasonably calculated to give educational

1

benefits to the child." *M. W.*, 725 F.3d at 135; *see* 20 U.S.C. § 1414(d) (2012). In New York, local Committees on Special Education are responsible for determining whether a child is entitled to educational services under the IDEA and, if so, developing an appropriate IEP. *See* N.Y. Educ. Law § 4402(1)(b)(1).

If a parent believes that the government has breached its obligations under the IDEA "by failing to provide their disabled child a FAPE, the parent may unilaterally place their child in a private school at their own financial risk and seek tuition reimbursement." *M.W.*, 725 F.3d at 135. In New York, the process for seeking tuition reimbursement begins when a parent files a due process complaint with the DOE. The due process complaint initiates administrative proceedings involving an impartial due process hearing before an Impartial Hearing Officer ("IHO"). *See id.* at 135 (citing 20 U.S.C. §§ 1415(b)(6), (f); N.Y. Educ. Law § 4404(1)).

The hearing before the IHO is governed by the three-pronged *Burlington/Carter* test, under which: "(1) the DOE must establish that the student's IEP actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them." *Id.*[1] "An IHO's decision may, in turn, be appealed to a State Review Officer ("SRO"), who is an officer of the State's Department of Education." *M.H. v. New York City Dep't of Educ.*, 685 F.3d 217, 225 (2d Cir. 2012). Any party aggrieved by the SRO's final administrative decision has the right to seek review of it by bringing a civil action in federal court. *See M.W.*, 725 F.3d at 135–36; 20 U.S.C. § 1415(i)(2)(A).

---

[1] The *Burlington/Carter* test is named after the Supreme Court's decision in *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–70 (1985), and *Florence Cnty. Sch. Dist. Four v. Carter. 510* U.S. 7, 12–13 (1993).

## BACKGROUND

The following is a summary of the administrative record.

### A. L.F.'s Public Education

In 2008, L.F., the child at the center of this case, was a 17 year old high school student. Her parents contend that she is disabled based on the following facts. In 2000 she began to experience intense depression. Since 2004, she had a history of eating disorders. She was repeatedly hospitalized. In September 2007, she was diagnosed with anorexia. In October 2007, she attempted to commit suicide. She has overdosed on medicine several times and she has self-harmed.

Until November 2007, L.F. attended LaGuardia High School of Music & Art and Performing Arts, a New York City public school. Academically, L.F. did well and she received good grades. However, L.F. missed several weeks of school during the 2007-2008 school year. She reported that she had difficulty going to school because of her anxiety, depression and fear.

In November 2007, the Parents requested that the DOE provide L.F. with home education following her suicide attempt. Between November 2007 and January 2008, the DOE provided L.F. with home education. In January 2008, L.F. traveled with her father to Israel. While in Israel, L.F. tried to commit suicide by taking an overdose of sleeping pills.

### B. L.F.'s Private Education

When L.F. returned to the United States in April 2008, she enrolled in La Europa Academy, a private school in Utah. La Europa Academy is a structured boarding school for teenage girls with histories of eating disorders, substance abuse, or behavioral issues. The school follows Utah's educational policies and prepares students for college. It provides structured education for students between 6.45am and 10.30pm. Since attending La Europa, L.F. has

3

continued to receive good grades, and her academic work may even have improved. According to a therapist, L.F.'s emotional problems have improved since she enrolled.

La Europa charged $9,950 monthly tuition. L.F.'s grandmother agreed to pay the tuition and expenses, and she made payments directly to La Europa Academy. The Parents contend that the grandmother made the payment to La Europa pursuant to an agreement between the Parents and the grandmother. They claim that this agreement is reflected by a document, dated April 3, 2008, which states:

> This statement will establish and confirm the understanding that [the grandmother] will provide for the funding of the expenses associated with her granddaughter's, [L.F.'s], attendance at La Europa Academy in Murray, Utah. It is further understood that this funding is offered as a loan to her daughter, [M.M.], to be repaid, without interest, at a later date.

The record does not contain any evidence regarding the terms of the loan.

## C. Administrative Proceedings

In April 2008, after the Parents unilaterally enrolled L.F. in La Europa Academy, they referred her case to a Committee on Special Education. The Committee began work in June 2008. However, its work was delayed between July and December 2008, because it was unable to interview L.F., as she was in Utah. The Committee interviewed L.F. in December 2008. After that interview, the Committee determined that L.F. was a good student, who performed well academically, and that her emotional problems were not impacting her education. In March 2009, the Committee concluded that L.F. was not disabled, since her psychiatric issues did not affect her strong academics. Accordingly, the Committee recommended placing L.F. in the general student population. The Committee met again in May 2009, to hear a report from La Europa about L.F.'s progress, and reaffirmed its conclusion.

On August 5, 2009, M.M. requested a hearing before an IHO. The IHO held a hearing on March 18 and 23 and April 16 and 30, 2010. At the hearing, the IHO heard testimony from the parents, representatives of La Europa, a therapist, and representatives of the DOE. On September 23, 2009, the IHO issued his Findings of Fact and Decision. Applying the *Burlington/Carter* test, the IHO concluded that the parents would have been entitled to reimbursement had they paid for L.F.'s tuition, but that they did not have standing to seek reimbursement because the grandmother paid for it. Specifically, the IHO rejected the Parents' argument that the Committee was improperly composed because it did not contain a representative from LaGuardia High School, but the IHO found that the properly-composed Committee had erred in classifying L.F. as not disabled. L.F. was disabled, according to the IHO, because, contrary to the Committee's findings, L.F.'s studies were adversely impacted by her emotional disturbance. The IHO further found that the placement at La Europa was appropriate, because La Europa met L.F.'s education needs due to its therapeutic interventions. And the IHO found that, even though the parents had unilaterally withdrawn L.F. from LaGuardia, the equities favored reimbursement because the parents had cooperated with the Committee in trying to resolve L.F.'s education. However, the IHO concluded that the parents were not entitled to reimbursement because they had not paid for L.F.'s tuition, her grandmother had. The IHO found that the purported loan document was not a legally binding document because it did not contain key legal elements.

The Parents and the DOE both appealed to the SRO. The SRO, which reviewed the administrative record before the IHO, issued its decision on January 24, 2011. The SRO disagreed with the IHO's finding that the DOE incorrectly classified L.F. as disabled. Instead, the SRO concluded that L.F. was not disabled. The SRO found it significant that L.F. consistently received good grades whether she was in public school, in home instruction or at La

Europa. And the SRO noted that La Europa's reports, indicating that L.F. had performed well at the school even when she suffered increased anxiety and depression, suggested that L.F.'s schoolwork was unaffected by her mental health. Accordingly, the SRO concluded that L.F. was not disabled for purposes of the IDEA because her education was not affected by her emotional disturbance. The SRO therefore concluded that the Parents were not entitled to reimbursement under the *Burlington/Carter* test.

The parents filed this action, seeking review of the SRO's decision, on May 23, 2011.

## DISCUSSION

Before me are the parties' cross-motions for summary judgment. A summary judgment motion in such an IDEA case is "in substance an appeal from an administrative determination, not a summary judgment." *Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n. 3 (2d Cir. 2005). "The Court in such cases conducts an independent judicial review and bases its decision on the preponderance of the evidence." *W.W. v. New York City Dep't of Educ.*, No. 12 Civ. 7196(AT)(HBP), 2014 WL 1330113, at *10 (S.D.N.Y. Mar. 31, 2014) (quotation marks and citations omitted).

The Court "must give due weight to the administrative proceedings [of the IHO and SRO], mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam). Where, as here, the reviewing officer disagrees with the IHO, a court's deference is to "the final decision of the state authorities." *A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009). Accordingly, the IHO's decision is entitled to "diminished weight." *Id.* When deciding whether to defer to the administrative decision, "[r]eviewing courts

must look to the factors that normally determine whether any particular judgment is persuasive, for example, whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." *R.E.*, 694 F.3d at 189.

The case before me presents two issues: (1) whether the DOE is required to pay reimbursement for L.F.'s private education under *Burlington/Carter*; and (2) if so, whether the Plaintiffs have standing to seek reimbursement.

### A. The *Burlington/Carter* Test

Under the *Burlington/Carter* test, "(1) the DOE must establish that the student's IEP actually provided a FAPE; should the DOE fail to meet that burden, the parents are entitled to reimbursement if (2) they establish that their unilateral placement was appropriate and (3) the equities favor them." *M.W.*, 725 F.3d at 135. The SRO denied the Parents' claim for reimbursement based on the first prong, whereas the IHO found in the Parents' favor on all three prongs.

### I. Whether L.F. received a Free and Appropriate Public Education:

The SRO found that L.F. was offered a FAPE in New York City's public schools, because she was not disabled. In reaching this determination, the SRO considered New York and federal regulations defining when a child with an emotional disturbance is disabled.

The regulations at issue, 34 C.F.R. § 300.8(c)(4)(i) and 8 N.Y.C.R.R. §200.1(zz)(4), provided that a child is disabled as a result of an emotional disturbance if two conditions are met. First, the child must exhibit certain behavioral characteristics, symptomatic of an emotional disturbance. And second, that characteristics must be exhibited over a long period of time and to a marked degree that adversely affects a child's performance in school.[2]

---

[2]    34 C.F.R. § 300.8(c)(4)(i) provides that :

The SRO found that L.F. exhibited two of those characteristics: "inappropriate types of behavior or feelings under normal circumstances," which was demonstrated by L.F.'s anxiety, body image, cutting, and eating disorder problems, and "a general pervasive mood of unhappiness or depression." However, the SRO concluded that L.F. was not disabled because her serious psychological issues did not affect her educational performance. Specifically, the SRO found that L.F. was unaffected by her emotional problems because she received good grades at LaGuardia (and at La Europa), she had good relationships with her parents and grandparents, and had a few age-appropriate friends, and her absences from school were not significant.

The SRO's decision amounts to a finding that students who have good grades cannot be found disabled. However, the law does not create any such limit. A students' continued receipt of good grades *may* constitute evidence indicating that the students' performance in school was not adversely affected by their emotional problems, but it is not necessarily conclusively. *See C.B. v. NYC Dep't of Education*, 322 F. App'x 20 (2d Cir. 2009)

---

> Emotional disturbance means a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:
> (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.
> (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
> (C) Inappropriate types of behavior or feelings under normal circumstances.
> (D) A general pervasive mood of unhappiness or depression.
> (E) A tendency to develop physical symptoms or fears associated with personal or school problems.

8 N.Y.C.R.R. §200.1(zz)(4) similarly provides that a child has an emotional disturbance if she exhibits one or more of those characteristics "over a long period of time and to a marked degree that adversely affects [her] educational performance."

(unpublished) ("continuity of [student's] successful performance" was one piece of evidence indicating no adverse impact on education); *N.C. v. Bedford Central School Dist.*, 300 F. App'x 11 (2d Cir. 2008) (unpublished) (evidence that student's grades had dropped only slightly indicated that student would not qualify as emotionally disturbed). But grades are not the only way to evaluate public education. In this case, the SRO's finding that L.F.'s educational performance was unaffected by her emotional problems has three major flaws.

First, the SRO focused on an assessment of L.F.'s grades without considering the more fundamental question of whether L.F. could even attend school. Under the IDEA, "the door of public education must be opened for a disabled child in a 'meaningful' way." *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 192 (1982)). The government must find ways to open the school house doors, by helping children who suffer from emotional problems to attend school. The record shows that during her time in the public school system, L.F. struggled to attend LaGuardia High School. She was absent from school for weeks at a time, and in her last months in the public school system (between September 2007 and January 2008) was unable to attend at all. During those last months, the DOE gave L.F. home instruction, a program which is normally only given to disabled students. The SRO erred in ignoring the evidence of L.F.'s inability to attend school. Few things could be more indicative of an emotional problem that "adversely affected" a student's education than one that prevented her from attending school.[3]

---

[3] The DOE argues that the SRO was not required to consider L.F.'s inability to attend public school, because they occurred over a year before the Committee met to discuss L.F.'s case and therefore were not relevant, since L.F. had been able to attend and participate in her education at La Europa. This argument is misplaced. These absences are the best evidence of L.F.'s (in)ability to participate in public school at the time she was sent to La Europa – and they occurred just months before L.F. began to attend La Europa. They are therefore highly relevant to the Parents' claim that L.F. was disabled when they sent her to La Europa.

9

Second, the SRO ignored another key indicator that L.F. was not able to receive an appropriate education from New York City's public schools: the fact that L.F. was unable to complete her last year in the City's High School system. During her last year, L.F. was only able to obtain 10.5 credits, whereas the City requires that students complete a minimum of 11.

And third, the SRO's finding that L.F. received consistently good grades is a misleading analysis of her grades. While L.F. generally received good grades at every school she attended, L.F.'s grades were declining while she was at LaGuardia and improved since she was placed in La Europa. The DOE contends that the fact that L.F. received good grades at La Europa, despite suffering emotional problems there, suggests that her emotional problems did not affect her education. This argument is meritless, since L.F.'s good grades at La Europa—in contrast to her extended absences from LaGuardia—more likely reflected the greater effectiveness of La Europa and its ability to accommodate L.F.'s disability.

In sum, I find that the SRO's determination that L.F.'s educational performance was not adversely affected by her emotional problems was "insufficiently reasoned to merit that deference." *R.E.*, 694 F.3d at 189. In reaching the conclusion that the SRO's decision was erroneous, I am effectively reinstating the IHO's analysis. The IHO summarized the finding that L.F. was disabled as follows:

> The record shows that the student has a long history of emotional/psychiatric problems which have adversely impacted upon her school functioning. Evidence of such occurred when the student was placed on home instruction for a period of time. Per the record, home instruction is provided to students who have a [sic] medically or psychiatrically incapable of going to school for a period of time. Although the student continued to do fairly well grade-wise, there were times when her disorder so consumed her that she was not able to attend school. Also, the student had been previously hospitalized for her condition.

10

For the reasons described above, I find this a persuasive analysis and defer to it. *See R.E.*, 694 F.3d at 189 ("[W]hen ... the district court appropriately concludes that the SRO's determinations are insufficiently reasoned to merit that deference ... it is entirely appropriate for the court, having ... turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis, which is also informed by greater educational expertise than that of judges, rather than to rely exclusively on its own less informed educational judgment.").

Since the IHO properly concluded that L.F. was disabled, it also properly concluded that she was denied a FAPE because the DOE failed to provide her with an IEP. *See id.* at 175 ("To ensure that qualifying children receive a FAPE, a school district must create an [IEP] for each [disabled] child.").[4]

### 2. Whether Unilateral Placement was Appropriate

"Parents who seek reimbursement bear the burden of demonstrating that their private placement was appropriate." *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007). In this case, the IHO found that the unilateral placement was appropriate because: "La Europa is a private residential treatment facility with a school along with therapeutic interventions. It caters to students who are bright and have emotional issues which affect their ability to function. The class sizes are small and credible testimony ... was presented to establish how the student's needs were met at La Europa." The SRO did not address this issue.

A court must decide whether a placement is appropriate by considering whether the placement "is reasonably calculated to enable the child to receive educational benefits,"

---

[4] The Parents also raise a procedural argument, that the DOE should be deemed to have failed to provide L.F. with a FAPE because the Committee on Special Education that was charged with creating L.F.'s IEP did not include someone from LaGuardia High School. This issue is moot, since I have determined that the DOE actually failed to provide L.F. with a FAPE because the SRO's determination that L.F. was not disabled was erroneous.

*Gagliardo*, 489 F.3d at 112, and whether it is targeted towards the child's disability, *id.* at 115 (upholding state's conclusion that private placement was inappropriate where "the chief benefits of the chosen school are the kind of educational and environmental advantages and amenities that might be preferred by parents of any child, disabled or not").

The DOE contends that La Europa was an inappropriate placement because it is a restrictive educational environment. The IDEA mandates that students be placed in the least restrictive environment, 20 U.S.C. §1412(a)(5)(A), and the norm in American education is that a student receives day education, not boarding school. Under the Second Circuit's case law, while it may be better for parents to place students in a less restrictive private placement if possible, parents have no obligation to find the least restrictive private placement possible. *See C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 836-37 (2d Cir. 2014) ) ("the restrictiveness of a private placement is a factor, by no means is it dispositive . . . where the public school system denied the child a FAPE, the restrictiveness of the private placement cannot be measured against the restrictiveness of the public school option"). Here, the record supports the IHO's finding that La Europa was appropriate to L.F.'s educational needs. The fact that La Europa was more restrictive than a public school does not on its own render it inappropriate. *See id.* at 837 (noting that "private schools [for the disabled] are necessarily restrictive as they do not educate disabled and nondisabled children together, and may be more restrictive than the public school from which the child was removed. Inflexibly requiring that the parents secure a private school that is nonrestrictive, or at least as nonrestrictive as the FAPE-denying public school, would undermine the right of unilateral withdrawal the Supreme Court recognized in *Burlington*."); *see also Cleveland Heights-Univ. Heights City Sch. Dist. v. Boss By & Through Boss*, 144 F.3d 391, 400 (6th Cir. 1998) ("It will commonly be the case that parents who have not been treated properly under the IDEA, and who exercise the right of parental placement, will place their child in a

12

school that specializes in teaching children with disabilities and thus will not satisfy the mainstreaming requirement. Adopting such a limitation on parental placements would therefore effectively vitiate [the remedy of retroactive reimbursement].")

The DOE also argues that L.F. has inappropriately benefitted from the restrictive environment at La Europa because it has treated her psychiatric problems, which is a medical benefit, not an educational one. This argument is also meritless, since, as the IHO found, the psychiatric treatment L.F. received at La Europa appeared to facilitate her education.

Accordingly, I defer to the IHO's well-reasoned analysis of this issue.

### 3. Whether the Equities Favor Reimbursement

"Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required." *Carter*, 510 U.S. at 16. "Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable." *Id.* The DOE contends that the equities are in its favor, because the Parents simply unilaterally took L.F. out of the public school system without providing the DOE with notice.

The IHO rejected this first argument, that the parents should be unable to seek reimbursement because of misconduct:

> The Department presents no evidence that the parent has not been cooperative in the process and/or development of the IEP, except for the delay in the evaluation of the student. [Which was because the student was out of state...] ... The school district has not demonstrated that the parent acted with the requisite level of unreasonableness of misconduct such that reimbursement should be denied on equitable grounds.

The SRO did not consider the issue. I hold that the administrative record supports the IHO's conclusion that the Parents worked through the school system, and had to pull their daughter out

13

when she started to suffer, and the DOE refused to accommodate her disability. In sum, the DOE has not met its burden of showing that the equities do not favor reimbursement.[5]

### B. Plaintiffs' Standing to Seek Reimbursement

The IHO concluded that the Parents were not entitled to reimbursement because the grandmother, not the Parents, paid for L.F.'s tuition. In reaching this conclusion, the IHO found that there was no loan agreement between the Parents and the grandmother because the terms of the loan were not established by the April 5, 2008 note. I reject the IHO's analysis. A note does not have to be a legally binding document in order to reflect that a loan was intended.

Moreover, finding that the Parents are unable to seek reimbursement because they themselves did not front the costs of L.F.'s education would lead to an inequitable result. Courts have consistently held "that a child's access to a FAPE cannot be made to depend on his or her family's financial ability to 'front' the costs of private tuition." *Mr. and Mrs. A ex rel. D.A. v. New York City Dep't of Education*, 769 F.Supp.2d 403, 427 (S.D.N.Y. 2011) (collecting cases, and holding that the school district should directly reimburse tuition fees, where parents had been unable to pay the tuition fees themselves). Limiting reimbursement to only those parents who can afford to pay private tuition out of pocket would have the inequitable result of "leav[ing] families of modest means with no options, while wealthier families [could] pursue[] reimbursement." *Id.* at 426. Given this Court's "broad discretion" to create relief under the IDEA, this Court will order the DOE to provide reimbursement to the Parents, with the provision that they first use any money they receive in reimbursement to repay their loan to the

---

[5] At oral argument, I asked the parties whether I should deny, or limit, reimbursement because the cost of La Europa was unreasonable. The DOE did not make this argument in its before the administrative agency and does not make this argument now. The administrative record therefore does not include any evidence of what a reasonable private school placement that would have allowed L.F. to receive an education despite her disability "should" have cost. Absent such evidence, the Court will not speculate about what was reasonable.

14

grandmother. *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, --- F.3d ----, Dkt. No. 12-4301, 2014 WL 1303156 (2d Cir. Apr. 2, 2014).

## CONCLUSION

For the foregoing reasons, the Parents' motion for summary judgment is granted and the DOE's motion is denied.

The parties shall, by July 18, 2014, submit a proposed judgment providing for reimbursement consistent with this Order. If the parties have any disputes regarding that proposed judgment, they shall submit those disputes to the Court in the form of a joint letter pursuant to my Individual Rule 2.E.

The Clerk is directed to mark the motions (Dkt. Nos. 12 and 17) terminated.

SO ORDERED.

Dated:  June 17, 2014
New York, New York

ALVIN K. HELLERSTEIN
United States District Judge